IN RE BUREAU OF WATER SUPPLY APPLICATION FOR
APPROVAL OF PLANS FOR OPERATION OF ROUND
VALLEY AND SPRUCE RUN RESERVOIRS.

ELIZABETHTOWN WATER COMPANY, APPELLANT, v. DE-
PARTMENT OF CONSERVATION AND ECONOMIC DE-
VELOPMENT, DIVISION OF WATER POLICY AND SUP-
PLY, WATER POLICY AND SUPPLY COUNCIL, *ET AL.*,
RESPONDENTS.

Argued January 10, 1966—Decided May 2, 1966.

*Mr. John R. Sailer* argued the cause for appellant (*Messrs. Sailer & Holzapfel*, attorneys; *Mr. John H. Murdoch, Jr.*, of the Pennsylvania Bar, of counsel).

*Mr. Oscar R. Wilensky* argued the cause for respondent, North Jersey District Water Supply Commission (*Mr. Charles E. Miller* on the brief).

*Mr. Avrom J. Gold*, Deputy Attorney General, argued the cause for respondents, Department of Conservation and Economic Development, Division of Water Policy and Supply, Water Policy and Supply Council (*Mr. Arthur J. Sills*, Attorney General of New Jersey, attorney; *Mr. Alan B. Handler*, First Assistant Attorney General, and *Mr. Robert L. Solan*, Deputy Attorney General, of counsel; *Mr. Avrom J. Gold* on the brief).

The opinion of the court was delivered by

PROCTOR, J. This appeal concerns the construction of the 1918 order of the Board of Conservation and Development (predecessors of the present Water Policy and Supply Coun-

cil, see *P. L.* 1929, *c.* 267; *N. J. S. A.* 13:1A–8 to 12, *N. J. S. A.* 13:1B–47 to 51) approving the application of the Elizabethtown Water Company to divert 20 million gallons per day (MGD) from the confluence of the Raritan and Millstone Rivers.[1] Although Elizabethtown was permitted to divert this water without charge, the approval contained, among others, the following condition:

"6. The Board hereby expressly reserves the right, in case it shall be necessary in the future to provide storage of storm waters along the Raritan and Millstone Rivers or their tributaries for the purpose of supplying municipalities or water companies that may lawfully take water from the said rivers and tributaries, to apportion the expense of providing the necessary storage among the petitioners [Elizabethtown] and such other companies or municipalities as may at the time have a right to take water from said rivers, their tributaries, or either of them, for public or domestic use, as may be equitable."

In 1931 Elizabethtown commenced taking the water authorized by the grant and is presently using the full 20 MGD.

In 1958 the Legislature adopted the Water Supply Law and the Water Bond Act designed to develop the Raritan river basin as a source of water supply for the northeastern metropolitan counties as well as the counties in the Raritan Valley. *P. L.* 1958, *c.* 34, *c.* 35; *N. J. S. A.* 58:22–1 to 19. In *N. J. S. A.* 58:22–2 the Legislature found and determined that:

"(a) Adequate supplies of wholesome water are essential to the health, welfare, commerce and prosperity of the people of the State. Such supplies will be best developed by long-range plans, to be put into effect in stages during a period of years. The formulation and execution of such plans cannot safely be allowed to wait until the shortage of water in the State becomes critical in all parts of the State.

*       *       *       *       *       *       *       *

(c) There is an immediate need for a new major supply of water to meet the present acute water requirements in the northeastern metropolitan counties and in the Raritan Valley, areas which directly and indirectly affect the commerce and prosperity of the entire State.

---

[1] The approval was actually given to several water companies which later merged to form the present Elizabethtown Water Company.

*   *   *   *   *   *   *   *

(i) It is therefore in the interest of the health, safety and prosperity of the people of the State as a whole, that immediate legislative action be taken towards making provision for storage facilities to augment natural water resources to make available an adequate supply of water for the most critical need and in addition provide for a long-range program for development, as shall be required, of the remaining water resources of the State."

After passage of the legislation and approval of the bond issue in the general election of 1958 (see *P. L.* 1958, *c.* 35; *N. J. S. A.* 58:22–19), two reservoirs, Spruce Run and Round Valley, were constructed at a cost of 39.5 million dollars. Spruce Run, with a capacity of 11 billion gallons, and Round Valley, with a capacity of 55 billion gallons (see *N. J. S. A.* 58:22–4), are intended to have a twofold function. First, by releasing water into the Raritan River or its tributaries during periods of low flow, the reservoirs will maintain minimum flow rates. *N. J. S. A.* 58:22–8 requires that the flow of water in the south branch of the Raritan River be maintained at 40 MGD at Stanton, 70 MGD at Manville and 90 MGD at Bound Brook. The importance of maintaining minimum flow rates was emphasized by the Legislature in *N. J. S. A.* 58:22–2(g) : "* * * The increased and sustained minimum flows will improve the quality of the water in the river, will tend to reduce the salinity in the tidal reaches, and will improve the upper river and its tributaries for recreational purposes." Providing water for consumption is the reservoirs' second major function. Such water may be delivered to the users directly from the reservoirs or may be released into the river and diverted at some point downstream. Elizabethtown employs the latter method, and its principal intake is about a half mile above the Bound Brook gauging station.

In December 1961 the Bureau of Water Supply filed an application with the Water Policy and Supply Council for approval of its plans to operate the Spruce Run and Round Valley reservoirs. Elizabethtown participated in the hearings which were held from May to November 1962. On December 5, 1964 the Council issued its order, affirmed by the Commis-

sioner of Conservation and Economic Development, which approved the Bureau's plans. The order also recognized Elizabethtown's 1918 grant as a "conditional prior and continuing right" to divert 20 MGD from the Raritan River, but directed that Elizabethtown should pay, along with other users, its proportionate share of the costs of constructing and maintaining the reservoirs.[2] See *N. J. S. A.* 58:22–10. Elizabethtown appealed (*R. R.* 4:88–8), and we certified the cause on our motion prior to argument in the Appellate Division.

Elizabethtown contends that any charge by the State for the use of 20 MGD from the Raritan River is illegal because "the 1918 consent and approval is a grant of a franchise by the State of New Jersey in which Elizabethtown has a vested interest" and that any such charge would be an unconstitutional violation of due process and an unconstitutional impairment of contract rights. We need not determine whether the 1918 grant is a "franchise" or a "vested interest"; such labels tend to conceal as much as they reveal. See *Port of N. Y. Auth. v. Hackensack Water Co.,* 41 *N. J.* 90, 98 (1963). There is no State or Federal constitutional issue in this case. The Water Policy and Supply Council is not attempting to cancel the 1918 grant and, in fact, will continue to permit Elizabethtown to divert the first 20 MGD of water made available for consumption by the Spruce Run-Round Valley project. However, this diversion is subject to the conditions contained in the grant itself. In giving its approval in 1918 the Board of Conservation and Development anticipated that future demand for water might necessitate the construction of storage facilities and provided in Condition 6 (quoted in full above) that the State could "apportion the expense of providing the necessary storage among the petitioners [Elizabethtown] and such other companies or munici-

---

[2] On June 1, 1965 the Commissioner of Conservation and Economic Development proposed to collect these costs by levying a charge of $32 per million gallons which would apply to the 20 MGD used by Elizabethtown under the 1918 approval.

palities as may at the time have a right to take water from said rivers [Raritan and Millstone], their tributaries, or either of them, for public or domestic use, as may be equitable."

Elizabethtown voluntarily accepted the conditions in the 1918 grant and defended them in *New Brunswick v. Bd. Conserv. & Devel.*, 94 *N. J. L.* 46 (*Sup. Ct.*), affirmed 94 *N. J. L.* 558 (*E. & A.* 1920). In rejecting New Brunswick's challenge to the validity of Condition 6 the court stated:

"The next point made is that the board had no legal authority to reserve to itself any power relating to the future storage of storm water and the apportionment of its cost between the parties entitled to participate in its use. *This is nothing more than an agreement by the petitioners [Elizabethtown] to pay a portion of the expenses, if it should become necessary, of providing in the future for the storage of storm water;* in other words the state board apprehended a future demand for water in excess of the ordinary flow of the two rivers, and the requirement of storage of storm water, which the statute permits, exacted from the petitioners a promise to pay their share of such expense because manifestly it might become very essential to the petitioners to have storm water stored if it should happen that the present flow was not sufficient to supply the demands of municipalities entitled to a supply of water. And while the condition does not impose terms on any subsequent applicant for the use of water which it might become necessary to store, we think the board exercised a wise precaution in making it a condition of this consent that, if the public interest required the impounding of the storm water of these two rivers, these applicants should bear their share of the expense." (94 *N. J. L.*, at *p.* 51; emphasis supplied.)

Elizabethtown does not dispute the necessity for the construction of these reservoirs to insure an adequate water supply for those who rely on the Raritan river basin as a primary source. In view of the plain language of Condition 6, it is clear to us that the Water Policy and Supply Council correctly determined that Elizabethtown must contribute with other users a proportionate share of the cost of the Spruce Run–Round Valley project.

There is no merit to Elizabethtown's contention that the sole contingency anticipated by the Board of Conservation and Development in imposing Condition 6 was the construc-

tion of a series of small inexpensive reservoirs similar to those which had been proposed to the board in 1910 by the Somerville Water Company. Nothing in the language of Condition 6 warrants such a construction, and there is no doubt that the board was looking to the unforeseeable needs of the future rather than the discarded plans of the past.

On May 20, 1965 Elizabethtown obtained the approval of the Water Policy and Supply Council to divert an additional 20 MGD. Elizabethtown is willing to pay for this new supply and argues that by doing so it is meeting its obligations under Condition 6. However, there is nothing in the language of Condition 6 which indicates that costs were to be apportioned on anything but an actual use basis regardless of whether such use was approved before or after the completion of the new storage projects. Elizabethtown was not required to apply for an additional 20 MGD and, if it had not, it would have still been liable for a share of the cost of the Spruce Run–Round Valley project because of its diversions under the approval of 1918.

Elizabethtown further contends that if it must contribute towards the costs of the new reservoirs it should not be liable for any part of such costs allocable to the maintenance of the minimum flow rates of 40 MGD at Stanton, 70 MGD at Manville and 90 MGD at Bound Brook. It argues that Condition 6 requires only that it contribute to that part of the reservoirs' costs actually devoted to producing water for consumption.

██ It is undeniable that stream flow regulation is vitally important to the maintenance of an ample supply of potable water. By cleansing the river of waste and sewage and by reducing the salinity in the tidal reaches, a high minimum flow rate provides suppliers with an improved quality of water (see *N. J. S. A.* 58 :22–2 (g)) which requires less filtration or treatment, and which can thus be delivered to the ultimate consumer at a lower cost. Indeed, Elizabethtown conceded at the hearing that it would directly benefit from the flow rates established by the Legislature (see *N. J. S. A.*

58:22–8) and in fact urged these flow rates when the proposed laws were before the Legislature. Moreover, the Board of Conservation and Development in the 1918 grant expressly recognized that an adequate stream flow was a prerequisite to Elizabethtown's right to divert 20 MGD when it found that under conditions then existing the proposed diversion would not cause "a reduction of the dry season flow of any stream * * * in an amount likely to produce unsanitary conditions or to otherwise unduly injure public or private interests." [3] Thus, Elizabethtown's contention that Condition 6 does not require it to share the cost of stream flow regulation is contrary to the expressed intent of the administrative body which authorized the 1918 diversion. Indeed, the statute granting the board its powers enjoined it from approving any application for water diversion which would cause an injuriously low flow rate. *P. L.* 1907, *c.* 252, *p.* 635.

The December 5, 1964, order of the Water Policy and Supply Council is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO.—6.

*For reversal*—None.

---

[3] In the summer of 1957, the year before the passage of the Water Supply Law, the flow of the Raritan River at the Bound Brook gauging station fell to 20 MGD even though earlier in the year it had been as high as 380 MGD. The Water Policy and Supply Council took judicial notice of the increasingly insanitary conditions in the Raritan River subsequent to 1918, caused in part by insufficient stream flow, and Elizabethtown does not challenge such finding.